UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| GLORIA STEGINSKY, On behalf of Herself and All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>XCELERA, INC., et al.,<br><br>    Defendants. | No. 3:12-cv-188 (SRU) |

RULING AND ORDER ON MOTION TO DISMISS AND MOTION FOR

DEFAULT JUDGMENT

This case concerns an alleged multi-year scheme to deflate a company's stock price so that the company's controlling shareholders could buy out minority shareholders at a bargain-basement price. Gloria Steginsky has sued Xcelera Inc., VBI Corp., Alexander Vik Gustav Vik, OFC Ltd., and Hans Eirik Olav alleging that defendants violated both federal securities law and their common law fiduciary duties to stockholders. Xcelera, VBI, Gustav Vik, and Alexander Vik filed a motion to dismiss for failure to state a claim upon which relief can be granted. OFC Ltd. and Hans Erik Olav failed to file an appearance,[1] and plaintiff seeks a default judgment against them. For the reasons set forth below, defendants' motion to dismiss is granted, and plaintiff's motion for default judgment is denied.

I.    STANDARD OF REVIEW

    *A. Motion to Dismiss*

---

[1] On May 14, 2012, plaintiff filed a motion for default entry (doc. #33). The court granted the motion on May 15, 2012 (doc. #35). Three weeks later on June 5, 2012, plaintiff filed the pending motion for default judgment.

1

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is designed "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (quotation marks omitted). *Plausibility* at the pleading stage is nonetheless distinct from *probability*, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely." *Id*. at 556 (quotation marks omitted).

   B.  *Motion for Default Judgment*

2

Upon entry of a default for "failure to plead or otherwise defend" against a complaint, a defendant admits every "well-pleaded allegation" of the complaint except those relating to damages. *See Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 63 (2d Cir. 1971), *rev'd on other grounds*, 409 U.S. 363 (1973); *Flaks v. Koegel*, 504 F.2d 702, 704 (2d Cir. 1974) ("While a default judgment constitutes an admission of liability, the quantum of damages remains to be established unless the amount of damages is liquidated or susceptible of mathematical computation"); s*ee also Time Warner Cable of New York City v. Barnes*, 13 F. Supp. 2d 543, 547 (S.D.N.Y.1998). Accordingly, the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true. *Id.*; *see also* 10A CHARLES WRIGHT, ARTHUR MILLER, & MARY KAY KANE, FEDERAL PRACTIVE § 2688 (3D ED.1998);  Fed. R. Civ. P. 8(d). Thus, the threshold for a default judgment mirrors the threshold for a motion to dismiss under 12(b)(6)—courts evaluate whether, when all facts are taken as true, a plaintiff has proven his case as a matter of law.

II.     BACKGROUND

The facts are drawn both from the complaint and from previous decisions in related cases. *Feiner Family Trust v. VBI Corp.*, 352 Fed. Appx. 461 (2d. Cir. 2009) ("Feiner III"); *Feiner Family Trust v. Xcelera.com*, 2008 WL 5233605 (S.D.N.Y. 2008) ("Feiner II"); *Feiner Family Trust v. VBI Corp.*, 2007 WL 2615448 (S.D.N.Y. 2007) ("Feiner I").  All alleged facts in the present complaint are taken as true for the purposes of this ruling.

Xcelera is a conglomerate of technology companies controlled by two billionaire brothers, Alexander and Gustav Vik, and their financier father through a company called VBI Corporation (together the "Xcelera Defendants"). In the late 1990s, Xcelera was one of the

fastest growing technology groups in the United States. But in 2001 the bubble lifting Xcelera's stock burst and the company's value plummeted.

Faced with a dwindling fortune, the Viks scrambled to minimize their losses. In 2004, Xcelera's stock had fallen from a high of $110 a share to around $1 a share. The brothers decided to stop complying with securities laws in the hopes of getting their stock off an open market. They began by refusing to file quarterly reports with the Securities and Exchange Commission ("SEC"). The brothers reasoned that, once the company was again privately held, they could legally withhold information from shareholders, and, with no way to know the value of their shares, these minority shareholders would sell their stock back to the Viks at a deflated price. By November of 2004, the American Stock Exchange ("AMEX") handed the brothers their first victory: because the company was delinquent in its filing requirements, the AMEX delisted Xcelera. The stock price sank to 25 cents a share. Two years later in November of 2006, the SEC deregistered all of Xcelera's securities. The company was once again private. In the process, the brothers lost about $225 million in stock value.

Freed of federally-mandated reporting requirements, the Viks instructed employees to refuse to disclose any information regarding the company's financial health to shareholders. Any shareholder who contacted the company was denied information regarding the brothers' plans to revive Xcelera and instead were told that they were welcome to sell back their shares at the lowest recorded stock price, 25 cents a share. Frustrated, many investors cut their losses and sold.

Four years and several lawsuits later, the Viks felt they were in a position to finally purchase all the remaining Xcelera shares. By 2010, many of Xcelera's holdings had once again become profitable.  The Viks knew this, but shareholders did not. In order to take advantage of

4

the company's still-deflated public price, the Viks privately approached a one-time director at Xcelera, Hans Eirik Olav, and asked him to form a shell company through which the Viks could make a tender offer on outstanding shares. Olav agreed. He registered a company, OFC Limited, in Malta, a country that does not require companies to disclose their directors' or shareholders' names.  OFC sent a letter to Xcelera shareholders in December of 2010 offering to buy up to 10,000 shares of Xcelera at the last known price, 25 cents. In the letter, OFC reserved the right to transfer shares to its "affiliates," but did not list the name of any affiliate.

Plaintiffs claim that the Viks' original decision to privatize their company was pretextual; their real aim has always been to drive down share prices so they could eventually buy back their company at a bargain-basement price. They then claim that the tender offer was the Viks' attempt to further manipulate Xcelera's stock price so that they could finally gain total control over the company. Plaintiffs make three claims against the Xcelera defendants, OFC, and Olav: First, that the defendants defrauded investors when they secretly schemed to artificially depress the market price of Xcelera stock. This fraud allowed them to manipulate the price of their stock in order to buy shares at low prices. Second, that they controlled OFC and are thus liable for OFC's attempt to trade on inside information when it lowballed investors in 2010. And third, that they breached their fiduciary duties to investors.

This is not the first time a minority shareholder in Xcelera has filed suit against the Viks. Plaintiffs' law firm, Abraham, Fruchter, & Twersky has represented minority shareholders in two other unsuccessful lawsuits against Xcelera. Judge Robert Patterson of the Southern District of New York dismissed the suits on three occasions, and the Second Circuit affirmed dismissal in one of those cases (the other was not appealed). The complaints in those suits were virtually identical to the complaint in this case, save one factual allegation—the tender offer made by

5

OFC. Plaintiffs argue that the addition of an allegation of a tender offer cures whatever defects may have existed in the prior suits.

### III. DISCUSSION

*A. Alleged Securities Fraud by the Xcelera Defendants: Market Manipulation Claims.*

Two previous suits against Xcelera were dismissed because plaintiffs did not allege sufficient facts to establish an intentional violation of the securities laws. As the Second Circuit explained, "to the extent [plaintiff] submits that defendants' fraudulent intent can be inferred from the fact that their failure to comply with their reporting obligations was the first step in a plan to buy back minority shares at depressed prices, the theory reduces to speculation." *Feiner III*, 352 Fed. App'x 461, 462 (2d Cir. 2009). According to the complaints in those cases, the Viks never affirmatively offered to buy back any shares, and, thus, both the District Court and the Second Circuit reasoned that jury would be forced to speculate that they someday would. "Absent any allegation of a 'going private' transaction, tender, or scheme to take advantage of depressed share prices, we cannot conclude that Feiner's urged inference of scienter is compelling." *Id.* The narrow issue in this case is whether the added allegation of a tender offer that plaintiff received six years after the company's alleged fraud cures the problem identified by both Judge Patterson and the Second Circuit.

To prove securities fraud, a plaintiff must plead sufficient facts to establish a defendant's scienter, that is, deceptive intent. *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001). "Plaintiff can establish this intent by either (a) alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* (citations omitted). In either case, "where

6

plaintiff's view of the facts defies economic reason it does not yield a reasonable inference of fraudulent intent." *Id.* at 140-41.

Plaintiff claims that the 2010 tender offer proves that the Viks were always playing the long game, that they tanked their stock in 2004 for the express purpose of buying it back cheaply from shareholders six years later. Otherwise, the logic goes, why would the Viks bother buying stock they know to be worthless? It must be, plaintiff contends, that the Viks, and by extension VBI and Xcelera, finally had the opportunity they have awaited, a window in which to take full ownership of a valuable company without the scrutiny of shareholders, the SEC, or a federal court.

Even if the Viks now see an economic advantage in owning more Xcelera stock, it does not necessarily follow that the Viks manipulated the market into yielding that advantage. The basic problem with the shareholders' original complaints was not the absence of one fact – a tender offer—but instead the absence of some link between the Viks' decision to goad the AMEX and the SEC into taking Xcelera's stock off the public market and the Viks' subsequent interest in acquiring minority shares. As Judge Patterson noted, any such link would need to explain why rational and successful businessmen would intentionally take an almost quarter billion dollar loss in the hopes of reaping a windfall many years later. *See Feiner II* at *6.

But the current complaint does nothing to explain how the Viks knew that Xcelera's value would rally years after a market bubble decimated the company's stock.[2] True, the Second

---

[2] Plaintiff contends that the manipulation in this case was "ongoing," and thus that there is no gap in time between the alleged manipulation and coup de grace of the tender offer. *See Trancript of Oral Argument, doc. # 69, at 10:25-11:4*. Under this theory, Xcelera defrauded consumers every time it offered to buy stock, a practice that escalated over time and ended in an all-out bid to buy every remaining share. But both Judge Patterson and the Second Circuit have already held that Xcelera's passive offers to buy complaining customers' stock did not constitute a market manipulation. Thus, if Xcelera had continued to respond to customer complaints in this way – in other words had never launched a tender offer—there would be no market manipulation as a matter of law. Because all of the conduct up to tender offer was perfectly legal, plaintiff must still link the tender offer and the Viks' 2004 decision to let their stock slide. They must provide some factual basis to believe that in 2004 the Viks manipulated

Circuit suggested that a tender offer might impugn the Viks' motive for letting their stock slide, presumably because a company that let its value tank only to turn around and buy back every last share likely knew that its fortunes would turn. But just because a fact might shore-up a claim does not mean that it always will. Here, six years expired between Xcelera's depreciation and the tender offer allegedly designed to reward the Viks for their original market manipulation. Unlike in cases where a corporate insider's takeover attempt follows on the heels of an alleged manipulation, plaintiff in this case must demonstrate that the Viks knew in 2004 that their company would rebound. *See, e.g.*, *Atchley v. Qonaar*, 704 F.2d 355 (7th Cir. 1983) (holding that jury could draw inference of fraud where plaintiffs alleged that directors depressed stock value for eight months, then joined together in a tender offer one month later). Plaintiff has to explain how the Viks knew that Xcelera could nimbly navigate a national recession, a realignment of the internet technology sector away from products and towards services,[3] and the myriad other obstacles faced by companies that must reinvent their businesses. Short of that, plaintiff at least has to plead sufficient facts to plausibly claim that the tender offer resulted in a windfall to defendants that offset their initial and substantial economic losses. Plaintiff has done neither.

In sum, even with the added allegation of a tender offer, plaintiff's complaint still "defies economic reason." The much more plausible explanation for the Viks' decision to let their stock fall off the public market remains that "defendants decided that the costs of regulatory compliance were too high for a company experiencing languishing share price and trading volume." *Feiner III* at 461. *See also Feiner Family Trust II*, 2008 WL 5233605 (S.D.N.Y. 2008)

---

the market because they knew they could one day buy back their entire company at a low enough price to offset an almost quarter billion dollar loss.

[3] For a description of Web 2.0, in particular its emphasis on websites that provide services like winnowing content or linking users, see *Richard Guo*, *Stranger Danger and the Online Social Network*, 23 BERK. TECH. L.J. 617, 619-20 (2008).

(dismissing complaint because plaintiffs did not establish that "defendants had a plan to make up for these losses from a future [attempt to reacquire stocks]"). The claim of fraud related to an alleged market manipulation by the Xcelera defendants is therefore dismissed.[4]

> B. *Alleged Securities Fraud by the Xcelera Defendants, OFC, and Hans Olav: Insider Trading Claims*

Plaintiff also contends that the Viks and Olav traded on inside information when they made a tender offer on all remaining Xcelera shares. Plaintiff asserts that the Viks and Olav knew that Xcelera was worth far more than 25 cents a share, but did not disclose that information to investors. According to plaintiff, this omission amounted to classic insider trading— corporate insiders made a profit by starving the market of information that would have caused a shareholder to hold out for a higher price.

But insider trading requires that a company have some obligation to disclose its confidential financial data to the public. Absent that duty, corporate officers are not in possession of any "non-public" information, but rather merely know how well their private company is doing. As the Supreme Court explained in *Chiarella v. United States*, "the duty to disclose arises when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." 445 U.S. 222, 228 (1980) (citations omitted).

Here, the Xcelera defendants shed their statutory obligation to disclose financial information the minute the SEC deregistered its stock. *See Polak v. Cont'l Hosts, Ltd.*, 613 F. Supp. 153, 157 (S.D.N.Y. 1985) (dismissing section 10b claim because company had no obligation to file financial information after it was de-registered). Nor did the Xcelera defendants

---

[4] Plaintiff admitted at oral argument that her claims against OFC and Hans Olav are limited to insider trading related to the tender offer. *See Trancript of Oral Argument, doc. # 69, at 4:17-21* (admitting that "since [OFC] didn't exist at the earlier time" "claims against OFC" "could be restricted to the time of the tender offer").

9

or Olav bear a common law duty to disclose information to shareholders. Xcelera is a Cayman Island corporation. Under Cayman Island law, corporations and their directors do not owe duties to their shareholders. *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 364 (S.D.N.Y. 2006) (noting that under English law, neither companies nor directors owe fiduciary duties to individual shareholders).[5] Indeed, the only way that either the Viks or Olav could have had a duty to disclose information to shareholders is if they had a "special factual relationship," a rare circumstance that requires "direct and close contact" between the director and shareholder. *Peskin v. Anderson*, [2001] 1 B.C.L.C. 372 ¶ 33. Plaintiff has not alleged that either the Viks, Olav, or OFC ever communicated directly with the plaintiff, other than through mass dispatches like letters to stockholders. Without an allegation of even the most incidental personal contact, plaintiff cannot establish any "direct and close contact" between the defendants and shareholders.

Even if a duty to disclose existed, plaintiff has not pointed to any specific omission, material misstatement, or confidential information that tilted the scales in this case. As the Southern District of New York has noted, "[t]he failure of the . . . complaint to provide any specific description of the alleged inside information or when it was obtained is grounds in itself for dismissing this action under Fed. R. Civ. P. 9(b)." *Stromfeld v. Great Atlantic & Pac. Tea Co.*, 496 F. Supp. 1084, 1087 (S.D.N.Y. 1980). For these reasons, the claims of insider trading against the Xcelera defendants, OFC, and Olav are dismissed.

C.  *Alleged Breach of Fiduciary Duties*

Plaintiff claims that the defendants breached their fiduciary duties to Xcelera's minority shareholders. Normally, a court can exercise supplemental "jurisdiction over nonfederal claims

---

[5] Absent a specific statutory command, Cayman Island law tracks British common law. *Wilson v. Humphreys*, 916 F.2d 1239, 1242 (7th Cir. 1990). Plaintiff does not claim that any Cayman Island statute created a fiduciary duty between Xcelera and its stockholders.

[when] parties [are] litigating other matters properly before the court." *Finley v. United States*, 490 U.S. 545, 548 (1989). As already reviewed above, plaintiff's nonfederal claims lack merit: Under Cayman Island law corporations and directors do not owe fiduciary duties to minority shareholders, and, absent some "special factual relationship," a shareholder cannot establish a claim for a breach of a fiduciary duty against individual officers.  Despite the obvious weakness of plaintiff's nonfederal claims, however, this court is compelled by Second Circuit precedent to dismiss pendent claims without prejudice whenever federal claims have been dismissed before trial. *Hefferan v. Corda*, 2012 WL 4465320 at *2 (2d Cir. 2012) (relying on *United Mine Workers of America v. Gibbs* and remanding with instructions to decline to exercise supplemental jurisdiction over state law claims where "federal claims are dismissed before trial"); *but see United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (explaining that "pendent jurisdiction is a doctrine of discretion" before laying out scenarios in which district court judges might decline to exercise jurisdiction over state law claims, including when federal claims are dismissed before trial). Plaintiff's claims against all defendants for a breach of a fiduciary duty are therefore dismissed without prejudice to refilling in state court.

IV.     CONCLUSION

For the reasons set forth above, defendants motion to dismiss is GRANTED and plaintiffs motion for default judgment is DENIED.

It is so ordered.

The clerk is directed to close this file.

Dated at Bridgeport, Connecticut, this <u>14th</u> day of March 2013.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge

11