# EXHIBIT A

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GLORIA STEGINSKY, Individually and on Behalf of All Others Similarly Situated, | : : : | Civil Action No. 3:12-CV-00188-SRU |
| | : | **AMENDED CLASS ACTION COMPLAINT** |
| Plaintiff, | : : | |
| vs. | : : | <u>JURY TRIAL DEMANDED</u> |
| XCELERA INC., OFC LTD., VBI CORPORATION, ALEXANDER M. VIK, GUSTAV M. VIK, and HANS EIRIK OLAV, | : : : : : | |
| Defendants. | : | |

Plaintiff alleges with knowledge as to herself and her own actions and as to all other matters on information and belief based upon the investigation of Plaintiff's counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings, court filings, media reports and other records obtainable from public sources concerning Xcelera Inc. ("Xcelera" or the "Company") and its subsidiaries. This Amended Class Action Complaint is being filed pursuant to the Court's Order made on September 4, 2014 to file an amended complaint reflecting the dismissal of the manipulation claim claims and claims arising under Section 14(e) of the Securities and Exchange Act of 1934 (the "Exchange Act").

## NATURE OF THE ACTION

1.      Xcelera deliberately refused to make filings required by the federal securities laws, or to otherwise make any information available concerning its operations, thereby destroying the trading value of the Company's common stock (the "Common Stock"). The end aim of the Vik family, which dominates the Company's affairs through its control of the board of

directors and ownership of more than 75% of Xcelera's Common Stock, has been to use this state of affairs to buy out minority shareholders at a discounted price at an opportune time.

2.     After the Company's de-registration and the effective elimination of any trading market for the Common Stock, Defendants purchased shares of Common Stock through privately negotiated transactions.  These transactions occurred when public shareholders called to inquire about the Company's operations and were met with a blanket refusal to provide any such information and, instead, an offer to buy the Common Stock at a discounted price.

3.     The Company's prosperity provided an impetus for Defendants to work more diligently towards eliminating the minority interest in Xcelera rather than continue to await the slow pace of sales arising from disgruntled shareholders throwing in the towel.  Thus, on or about December 17, 2010, defendant OFC Ltd. ("OFC"), a Maltese corporation under the control and domination of the Viks, commenced a tender offer (the "Tender Offer") to purchase the remaining minority shares of Common Stock for $0.25 per share.  The Tender Offer materials, however, fail to disclose any information whatsoever concerning the current financial condition or operating results of Xcelera.

4.     Xcelera is, in fact, worth substantially more than the $0.25 per share offered by OFC in the Tender Offer.  Defendants have only been able to purchase Xcelera common stock at that price because they have deliberately refused to provide any information concerning the Company's financial condition or results of operation, while at the same time destroying the trading market in the Common Stock.

5.     Plaintiff is seeking monetary damages to compensate for the losses she suffered.

## JURISDICTION AND VENUE

6.     The claims asserted herein arise under and pursuant to Sections 10(b), 20(a) and 20A(a) of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a) and 78t-1(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.  This Court has jurisdiction over those claims pursuant to Section 27 of the Exchange Act, 15 U.S.C. §§78aa, and 28 U.S.C. §1331.  This Court has jurisdiction over the common law claims pursuant to 28 U.S.C. §1367.

7.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b), because Xcelera operates out of offices located in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

## PARTIES

### Plaintiff

8.     Plaintiff Gloria Steginsky sold 100,010 shares of Common Stock pursuant to the Tender Offer for $0.25 per share.  A copy of a Certification signed by Ms. Steginsky required by Section 21D(a)(2)(A) of the Exchange Act, 15 U.S.C. §78u-4(a)(2)(A), is attached hereto as Exhibit A.

### Defendants

9.     Defendant Xcelera is a Cayman Islands corporation, which maintains its principal executive offices at 10 Ashton Dr., Greenwich, CT 06831.  Until November 3, 2006, Xcelera's Common Stock was registered with the SEC pursuant to Section 12(g) of the Exchange Act.

10.     Defendant OFC Ltd. ("OFC") is a Maltese limited liability company with a registered office located at 13 Curate Fenech Street, Birzebbugia, Malta.  OFC is a shell

company created solely to serve as the vehicle for completing the Tender Offer.  OFC filed its Memorandum and Articles of Association with the Malta Financial Services Authority on or about July 1, 2010.

11.     Defendant VBI Corporation ("VBI") is incorporated in the British Virgin Islands and maintains its office at 10 Ashton Dr., Greenwich, CT 06831.  VBI, according to public filings made with the SEC by Xcelera, owns 61.2% of the Company's voting securities, and is owned by Erik Vik, father of Defendants Alexander Vik and Gustav Vik.  Also, according to a declaration filed by defendant Alexander M. Vik in *Sebastian Holdings, Inc. v. Kugler*, Civil Action No. 3:08 CV 1131 RNC (D. Conn.), "Xcelera is controlled by VBI."

12.     Defendant Alexander M. Vik ("Alexander Vik") is, and at all relevant times was, Chairman of the Board of Directors and Chief Executive Officer ("CEO") of Xcelera. According to the Company's 2003 Form 20-F, Alexander Vik, beneficially owns 9.8% of Xcelera's voting securities.

13.     Defendant Gustav M. Vik ("Gustav Vik") is, and at all relevant times was, a Director and the Executive Vice President, Treasurer and Secretary of the Company.  According to the Company's 2003 Form 20-F, Gustav Vik beneficially owns 5.3% of Xcelera's voting securities.

14.     Defendants Alexander Vik, Gustav Vik, and VBI (collectively, the "Viks" or the "Vik Defendants"), beneficially own 76.3% of the voting securities in Xcelera, thereby controlling the Company's significant corporate events and transactions.

15.     Defendant Hans Eirik Olav ("Olav") is, and at all relevant times was, a Director of the Company.  Olav is listed as a contact person in connection with the Tender Offer.

4

## CLASS ACTION ALLEGATIONS

16.     Plaintiff bring this action as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure on behalf of a class (the "Class"), consisting of all those who sold Xcelera Common Stock to any of the Defendants.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which the Defendants have or had a controlling interest.

17.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Xcelera or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

18.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct that is complained of herein.

19.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

20.     Common questions of law and fact exist as to all members of the Class.  Among the questions of law and fact common to the Class are:

    (a)     whether Defendants engaged in manipulative acts violating Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC;

(b)     whether OFC purchased shares of Common Stock while in possession of material information concerning Xcelera in violation of Section 20A of the Exchange Act;

(c)     whether Xcelera, VBI, the Viks, and Olav are control persons of Xcelera and OFC within the meaning of Section 20(a) of the Exchange Act;

(d)     whether Defendants have breached their fiduciary duties to the sellers; and

(e)     whether members of the Class have sustained damages and the proper measures of damages.

21.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in managing this case as a class action.  The names and addresses of the holders and sellers can be obtained from the records of the Company or its agents.

## SUBSTANTIVE ALLEGATIONS

22.     Xcelera initially operated under the name "Scandinavia Company, Inc."  On April 26, 1999, Scandinavia/Xcelera announced its planned transition from a hotel company into an international internet holding company.  The Company changed its name to "Xcelera.com, Inc." on October 26, 1999.  Xcelera described its business as the leveraging of its "core competencies in caching, application and content distribution, content management, searching, security solutions, storing and streaming by continuing to acquire interests in technologies, products, services, people and companies, and to manage its portfolio of assets."

6

23.     Xcelera originally listed its Common Stock for trading in the U.S. on the American Stock Exchange ("AMEX") where the stock soared in price to as high as $110.00 per share in March 2000 during the dotcom bubble.  Xcelera's shares are no longer publicly traded and have not been traded in the U.S. since the SEC revoked the registration of its shares in November 2006.  Xcelera denied that it was a closed-end investment company.

24.     In 2004, the SEC began to question certain of the Company's public disclosures, asserting that Xcelera was, in fact, a closed-end investment company subject to regulation under the Investment Company Act of 1940.  The Viks reacted by refusing to make the detailed SEC filings required by Section 13(a) of the Exchange Act concerning the Company's financial condition and operating results.

25.     The Viks' willful failure to cause Xcelera to comply with the reporting requirements of the Exchange Act caused the AMEX on November 6, 2004 to de-list the Common Stock.  This potential de-listing was first reported in a September 22, 2004 press release stating:

> The Company is currently delinquent in its filing requirements with the SEC relating to its 2004 Form 20-F.  As a result of this delinquency, the Company received notice on September 20, 2004 from the American Stock Exchange that the Company no longer complies with the Exchange's continued listing standards, as set forth in Section 1101 of the American Stock Exchange Company Guide, and that its Common Stock is subject to being delisted from the Exchange.  The Company plans to appeal the Exchange's determination.

At that time, the Company stated that it had approximately $62 million in cash, cash equivalents and marketable securities and no material debt.

26.     In reaction to this news of a likely de-listing from the AMEX, Xcelera's Common Stock declined in price by more than 25% from its previous trading price of $1.03 per share to close at $0.76 per share.

27.     On November 5, 2004, Xcelera issued a press release announcing that the Listing Qualifications Panel of the American Stock Exchange Committee on Securities had affirmed the determination of the staff of the Listing Qualifications Department to delist the Company's Common Stock as a result of the Company's non-compliance with its Securities and Exchange Commission filing requirements.   In reaction to this announcement, Xcelera's Common Stock plummeted by more than 60% from its prior closing price of $0.69 per share to close the next trading day of November 8, 2004 to $0.25 per share on heavy volume.

28.     On November 3, 2006, the SEC revoked the registration of Xcelera securities. This followed the Company's willful failure to comply with the reporting obligations of the Exchange Act.   Their attorney, Peter McDonald, stated in an October 27, 2006 administrative proceeding that Xcelera had no objection to the SEC taking such action.

29.     Defendants intentionally caused the Company's Common Stock to be de-registered so that they could continue to depress the price and thereby be able to buy the shares owned by the public stockholders of Xcelera at a discounted price.   This strategy of starving the market and investors for any information concerning Xcelera's financial condition and results of operations continued after the Company was delisted and de-registered.   Indeed, in early 2005, the Viks caused Michael J. Kugler, who had previously been engaged in investment relations for Xcelera, to stop providing any information concerning the Company or its operations to investors.

8

30.     The last SEC filing made by Xcelera occurred on August 2, 2005 and consisted of a Form 20-F disclosing in summary fashion that the Company's annual reports for the 2004 and 2005 fiscal years would not be filed on time as result of comments received from the SEC concerning its 2003 annual report and that the reports would be filed as soon as practicable. Those reports were never filed with the SEC.

31.     The Viks were well placed to engage in this conduct because of their vast wealth. According to a declaration filed by defendant Alexander Vik in *Sebastian Holdings, Inc. v. Kugler*, Civil Action No. 3:08 CV 1131 RNC (D. Conn.), he has approximately $500 million in investments managed through a series of portfolios.  Thus, the Viks could bide their time and buy back the Common Stock owned by public shareholders at discounted prices as those shareholders became tired of holding an investment which was not tradable in the United States because of the revocation of the registration of the Company's securities by the SEC.

32.     Michael Kugler, who had previously performed the investor relations function for Xcelera, was instructed by defendant Alexander Vik to tell investors that they "can either contact their accountants about the propriety of writing off their investment as a tax loss, or that they may, if they so wish, sell their shares back to Xcelera at the price at which Xcelera last publicly traded."  *Feiner Family Trust v. VBI Corp.*, Civil Action No. 07-CV-0914, Declaration of Michael J. Kugler, at ¶4 (S.D.N.Y. May 18, 2007) (attached hereto as Exhibit B).

33.     This tactic enabled the Viks to buy Xcelera Common Stock for $0.25 per share from disgruntled investors.  The pace of sales by disgruntled public shareholders, however, was not fast enough to satisfy the business objectives of the Viks.  Therefore, in order to accelerate the process, on or about December 17, 2010, Defendants commenced a tender offer to acquire all

the shares of Xcelera Common Stock held by the Company's minority public shareholders for $0.25 per share, the very price those shares dropped to on November 5, 2004, the date that it was announced that AMEX would delist Xcelera's Common Stock.

34.     The price of $0.25 per share materially undervalues Xcelera's Common Stock. Xcelera has substantial financial assets.  Indeed, according to its last filing with the SEC on August 2, 2005, the Company had $39 million in cash and no debt, with approximately 126 million shares outstanding, amounting to $0.31 per share in cash alone.

35.     In addition to its financial assets, Xcelera also owns several operating subsidiaries.  The most prominent of these subsidiaries is Mirror Image, a provider of internet infrastructure solutions since 1999.  Mirror Image is a Delaware corporation with its principle offices located at 2 Highwood Drive, Tewksbury, Massachusetts 01810.  Mirror Image promotes itself as an innovative computing solution provider that offers e-businesses a smarter way to create more engaging web experiences for users worldwide while increasing revenue opportunities, reducing infrastructure costs and increasing customer satisfaction.  Mirror Image operates in the same marketplace as Akamai Technologies, Inc. and Limelight Networks, Inc., which trade at substantial premiums to their sales and earnings.  For the past four years, Mirror Image has been ranked as a top Content Delivery Network provider by *Internet Retailer*.

36.     Protegrity Corporation ("Protegrity"), another company owned by Xcelera is a Connecticut corporation with its principle offices located at 5 High Ridge Park, Stamford, Connecticut 06905.  Protegrity is a leader in enterprise data security management that provides centralized data security management solutions to protect sensitive information.  Protegrity's presence spans the globe with offices located in the U.S., Europe, Asia, and the Middle East.

10

Protegrity has a rapidly growing customer base, which includes several states, Amtrak, and 25% of the 20 largest U.S. retailers.  Protegrity has invented core encryption technologies and owns key patents in its field of expertise, which detect intrusions into databases and provide for data encryption.  Indeed, Protegrity's patents are valuable assets for which the company has, as recently as May 2010, commenced lawsuits in Connecticut federal court in order to protect its proprietary technologies.

37.     On or about January 24, 2011, Protegrity issued a press release touting its strong financial performance, stating:

> STAMFORD, Conn., Jan. 24, 2011 – Protegrity USA, Inc., a leading provider of end-to-end data security solutions, today announced that the company achieved several milestones in its fiscal year which ended on Dec. 31, 2010 (FY10).  These accomplishments include a 100 percent increase in Q4 2010 total revenue compared to Q4 2009 and a 77 percent increase in license fees from FY 2009 to FY 2010.  Total income from all sources for the fiscal year increased by 71 percent compared to the previous year.  This momentum reflects strong demand for Protegrity's software solutions among corporations and government organizations looking to eliminate serious risks and liabilities associated with unprotected sensitive data.
>
> "The explosion of cloud computing and heightened regulatory requirements for securing sensitive data have created a huge challenge for large enterprises that demand more affordable, scalable solutions to stay compliant," said Iain Kerr, President and CEO of Protegrity USA, Inc.  "The fact that Protegrity provides the highest level of data security, transparency and performance available combined with this trend have enabled the momentum that we are experiencing this year. We have also seen a surge in demand for our tokenization technology, which enables companies to reduce costs associated with PCI and HIPAA compliance."
>
> CUSTOMER MOMENTUM
>
> Protegrity now works with 25 percent of the top 20 largest U.S. retailers, and also saw increased demand for its data security solutions across other vertical industries including manufacturing, financial

11

services, travel and transportation, healthcare and government.  During 2010, Protegrity surpassed its 200th enterprise deal.  Customer interest in Protegrity Tokenization, one of the fastest growing solutions within the company's data security product portfolio, was a major catalyst for this momentum.

Protegrity signed new contracts and expanded existing ones in 2010 with major corporations and government organizations, including Amtrak, Datapipe, Garanti Bank, Lotte Department Stores, Marathon Oil, the State of Utah, the State of Michigan, a number of Japanese government agencies and Winn-Dixie.

PARTNER MOMENTUM

During 2010, Protegrity established and strengthened partnerships with several technology leaders including Teradata, IBM, McAfee, PGP (now Symantec) and Thales, as well as system integrators and resellers such as JCS & Associates, STIGroup, Xbridge Systems and Telus Communications.  All of these partnerships have enabled Protegrity to extend its data security capabilities across different IT environments and into new markets worldwide.

"We have enjoyed a very strategic partnership with Protegrity for over five years," said Randy Lea, VP of Technical Marketing and Product Management at Teradata Corporation.  "Working closely together, Teradata and Protegrity have helped our joint customers drive down risk and efficiently manage complex regulatory compliance around their critical business intelligence and analytical data initiatives.  The Protegrity Data Security Platform continues to be a great complement to the Teradata Enterprise Data Warehousing family of products."

A summary of FY 2010 highlights include:

- 77 percent year-over-year license revenue growth

- 71 percent year-over-year growth in all income items combined

- 100 percent year-over-year revenue growth in Q4

- Maintenance and support fees represented 42 percent of total FY10 revenue

12

- 80 percent year-over-year increase in average contract value

- Deals with 25 percent of the top 20 largest U.S. retailers

- Signed new partnership agreements with major technology leaders and system integrators including IBM, McAfee and PGP (now Symantec)

38.     Ineo USA, Inc. ("Ineo"), another wholly-owned subsidiary of Xcelera, provides security solutions to the telecommunications industry.  Ineo is a Delaware corporation with its principle offices located at 2440 SW Cary Parkway, Suite 115, Cary, North Carolina 27513. Ineo's technologies are marketed and sold throughout North America and Europe to major telecom companies, carriers and service providers.  Ineo's website touts its growing success through securing significantly large clients in North America.

39.     Xcelera's subsidiaries are valuable business which not only remain going concerns, but are continually growing.  However, the extent of their value is unknown as none of them publicly report any details of their earnings and revenues.

40.     Xcelera also has financial interests in several software companies.  For example, Xcelera has an approximate 13.6% interest in Ceetron AS, a provider of advanced 3D visualization products and solutions to customers within the energy, marine, aerospace and automotive industries.  Xcelera also has a significant financial interest in Confirmit, Inc., a provider of software that enables organizations to conduct customer feedback, employee feedback, and market research programs which employs over 200 people across the world. Defendants Alexander Vik and Olav serve on Confirmit's board of directors.

41.     In addition, Xcelera had significant financial interests in companies which were sold for cash and other valuable consideration.  For example, Xcelera had an interest in Escenis

13

AS, a provider of strategic solutions for content management and web publishing, which was acquired by in 2008 by Vizrt, Ltd. for 3 million shares of Vizrt stock and approximately $17.8 million in cash. Xcelera also had an interest in Scene7, Inc. which was sold to Adobe Systems in 2007 for an undisclosed sum.

**The Tender Offer**

42.     On or about December 17, 2010, OFC disseminated a letter of transmittal addressed to the Company's minority shareholders seeking to purchase up to 10,000,000 ordinary shares of Xcelera at a price of $0.25 (U.S. dollars) per share in the Tender Offer with a stated expiration date of January 31, 2011. In the Tender Offer materials, Defendant OFC specifically reserved the right to change the number of shares to be purchased and the price for those shares. OFC also reserved the right to extend the expiration date of the Tender Offer.

43.     Although the Tender Offer is purportedly being conducted by defendant OFC, the true actors seeking the tender of Xcelera's Common Stock are, in fact, Xcelera and the Vik Defendants. Defendant OFC is only a shell company, which is being used in the Tender Offer as a result of the anonymity afforded to the actual shareholders of Maltese companies. Indeed, it is the Vik Defendants' *modus operandi* to use Maltese companies to hide their identity, and they have used such Maltese entities in the past. Tellingly, defendant Olav, an Xcelera director, is listed with the Tender Offer's transfer agent, the American Stock Transfer & Trust Company, LLC, as the contact person with respect to the Tender Offer. OFC also reserved "the right to transfer or assign, from time to time, in whole or in part, to one or more of its affiliates, the right to purchase the Shares tendered herewith." Those affiliates of OFC include Xcelera and the Vik Defendants.

14

44.     The Tender Offer fails to disclose any information concerning Xcelera's current financial condition or results of operations.

45.     No filings have been made with the SEC in connection with the Tender Offer.

46.     The Tender Offer was extended from January 31, 2011 until, at least, February 21, 2011.  Plaintiff was informed of the extension by her broker and did not receive written notice of the extension from OFC or the transfer agent.  On or about April 18, 2011, Plaintiff received notice in her brokerage statement that her shares of Xcelera common stock had been purchased in the Tender Offer.

## COUNT I
### (Against Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder)

47.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48.     This count is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, on behalf of Plaintiff and other members of the Class against Defendants.

49.     Defendants acted with the intent of carrying out a plan, scheme and course of conduct which was intended to and did induce Plaintiff and other members of the Class to sell their Xcelera stock back to the Company at artificially deflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Defendants took the actions set forth herein.

50.     Defendants owed a duty to Plaintiff and other members of the Class not to take advantage of their access to inside information by purchasing Xcelera Common Stock from

Plaintiff and the Class based on material, nonpublic information which they knew or should have known had been acquired directly or indirectly from Xcelera, or someone working on its behalf.

51.     Defendants traded in Xcelera Common Stock while in possession of material, nonpublic information which they did not disclose and which they knew or should have known had been acquired directly or indirectly from Xcelera, or someone working on its behalf.

52.     By virtue of the foregoing, the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

53.     As a result of the conduct set forth herein, Plaintiff and other members of the Class sold Xcelera's Common Stock at artificially deflated prices and were damaged thereby. Plaintiff and similarly situated members of the Class are entitled to recover from Defendants, jointly and severally, such damages that represent the difference between the amount received by these class members for their Xcelera stock and the true value of the Company's shares or, alternatively, the price at which those securities would have traded had Defendants complied with the federal securities laws or otherwise caused the Company's results of operations and financial condition to be publicly disclosed and Xcelera stock to be traded on a securities exchange.

54.     This claim for relief was brought within two years after discovery of the facts constituting the cause of action and within five years after the cause of action accrued.

## COUNT II
### (Against OFC Pursuant to Section 20A(a) of the Exchange Act)

55.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

16

56.     This count is brought pursuant to Section 20A(a) of the Exchange Act on behalf of Plaintiff and the Class against Xcelera based upon the information that defendant OFC was the entity purchasing the Company's stock from Plaintiff and other members of the Class. Should that purchaser prove to be one of the other Defendants or any entity under their control, Plaintiff intends to also name those persons as Defendants in this claim for relief.

57.     Defendant OFC violated Section 10(b) and Rule 10b-5 promulgated thereunder as alleged above in Count I.

58.     Plaintiff, contemporaneously with OFC's purchases which are the subject of this claim for relief, sold her stock in Xcelera.

59.     Plaintiff has been damaged and, pursuant to Section 20A(b)(1), is entitled to recover the profits gained in the transaction by Defendants.

60.     This claim for relief is being brought within five years after the date of the last transaction which is the subject of the violation.

### COUNT III
**(Against Defendants Xcelera, VBI, Alexander Vik, Gustav Vik and Olav Pursuant to Section 20(a) of the Exchange Act)**

61.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

62.     This claim is brought by Plaintiff against defendants Xcelera, VBI, Alexander Vik, Gustav Vik, and Olav.

63.     Defendants Xcelera and OFC are primary violators of Section 10(b) and Rule 10b-5 promulgated thereunder, as alleged in Count I above, and of Section 20A as alleged in Count II above.

17

64.     Defendant VBI is a control person of Xcelera based upon its owning a majority of the outstanding Common Stock of Xcelera and the family relationships between its owners Erik Vik and defendants Alexander Vik and Gustav Vik who serve on the Company's board of directors.

65.     Defendants Alexander Vik and Gustav Vik are control persons of Xcelera because of their service on the board of directors of Xcelera, their ownership of significant percentages of the outstanding Xcelera Common Stock, and their family relationship with each other and the shareholders of VBI.  A Form 20-F filed by Xcelera with the SEC on or about July 31, 2003 identifies defendants VBI, Alexander Vik and Gustav Vik as part of a single control group.

66.     Defendant Olav is a control person of Xcelera because of his service on the board of directors of Xcelera.

67.     Defendants Xcelera, VBI, Alexander Vik, Gustav Vik and Olav are control persons of OFC.

68.     Defendants Xcelera, VBI, Alexander Vik, Gustav Vik and Olav had, and continue to have, the power and authority, directly or indirectly, to cause, and did cause, OFC to engage in the Tender Offer in violation of the Exchange Act.

69.     By virtue of their positions as controlling persons of Xcelera and OFC, the Vik Defendants, Xcelera and Olav are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of this wrongful conduct, Plaintiff and the other members of the Class have been damaged thereby.

18

**COUNT IV**
**(Breach of Fiduciary Duties Against Defendants**
**Xcelera, Gustav Vik, Alexander Vik and Hans Eirik Olav)**

70.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

71.     This claim for relief is brought by Plaintiff on behalf of the Class against defendants Xcelera, Alexander Vik, Gustav Vik and Olav for breaching their fiduciary duties and/or aiding and abetting the breach of fiduciary duties in connection with soliciting minority shareholders to sell Xcelera Common Stock without disclosing any information about the Company.

72.     Defendants Xcelera, Alexander Vik, Gustav Vik and Olav engaged in contact with Plaintiff and other minority shareholders of Xcelera for the purpose of soliciting Plaintiff and other minority shareholders of Xcelera to sell their Xcelera stock to Defendants.   By concealing all information about Xcelera from their solicitations, these Defendants breached the fiduciary duties they owed to Plaintiff and other members of the Class, including the fiduciary duty of disclosure.

73.     Defendants, rather than use the information concerning Xcelera's results of operations and financial condition to advance commercial and financial opportunities for the benefit of Xcelera's shareholders have, singly and in concert, promoted their own personal interests at the expense of Plaintiff and members of the Class.

74.     Defendants purchased shares of the Company stock from Plaintiff without disclosing relevant information concerning the Company's financial condition, results of operations and future business prospects.   Similarly, OFC, acting at the direction of the other

Defendants, solicited Plaintiff to sell her shares of Xcelera Common Stock to Defendants while failing to disclose relevant information concerning the Company's financial condition, results of operations and future business prospects.

75.     As a result of their wrongful conduct and actions, Defendants have breached their fiduciary duties, including the fiduciary duty of disclosure and/or aided and abetted the breach of fiduciary duties.  Consequently, Plaintiff and members of the Class have been damaged.

## PRAYER

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Declaring this action to be a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure and certifying Plaintiff as a representatives of the Class and Plaintiff's counsel as class counsel pursuant to Rule 23(g);

B.     Declaring that Defendants and each of them has breached their fiduciary duties and/or aided and abetted the breach of fiduciary duties owed to Xcelera's minority shareholders, and finding that Defendants violated the federal securities laws;

C.     Awarding compensatory damages in favor of Plaintiff and the other similarly situated Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.     Awarding Plaintiff punitive damages with respect to her breach of fiduciary duty claim;

E.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

20

F.      Such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury on all triable issues.

Dated:  October __, 2014

**ABRAHAM, FRUCHTER & TWERSKY, LLP**

/s/  Jeffrey S. Abraham
Jeffrey S. Abraham, *pro hac vice*
Philip T. Taylor, *pro hac vice*
One Penn Plaza, Suite 2805
New York, NY 10119
Telephone: (212) 279-5050
Facsimile:  (212) 279-3655
jabraham@aftlaw.com
ptaylor@aftlaw.com

**SCOTT+SCOTT LLP**
Joseph P. Guglielmo
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
Facsimile:  (860) 537-4432
jguglielmo@scott-scott.com

*Attorneys for Plaintiff*