EXHIBIT B

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| Gloria Steginsky,<br>　　　　Plaintiff,<br><br>　　　　　v.<br><br>Xcelera, Inc., et al.,<br>　　　　Defendants. | No. 3:12-cv-188 (SRU) |

## RULING ON MOTION TO CERTIFY CLASS

This lawsuit is brought by putative class representative Gloria Steginsky, a minority

shareholder of defendant Xcelera, Inc. against Xcelera, VBI Corporation, Alexander and Gustav

Vik ("the Viks"), OFC Ltd., and Hans Eirik Olav.  Steginsky alleges that the defendants engaged

in a multi-year scheme to deflate Xcelera's stock price so that the company's controlling

shareholders could buy out minority shareholders at a bargain-basement price.  As part of that

scheme, OFC, a shell corporation under the control and domination of the Viks, was created for

the sole purpose of executing a tender offer to purchase Xcelera stock at $.25 a share.  Steginsky

asserts that the tender offer price was unfairly low and that the defendants induced minority

shareholders to sell at this low price by withholding information about Xcelera's financial state,

in violation of federal securities laws and common law fiduciary duties.

Steginsky filed a motion for class certification under Fed. R. Civ. P. 23 (doc. # 126),

seeking to certify a class of shareholders who tendered Xcelera stock to OFC.  In that motion,

Steginsky also sought reconsideration of my previous ruling that she lacks standing to sue on

behalf of all shareholders who sold Xcelera stock to the defendants on or after February 6, 2007.

I held oral argument on January 5, 2015 and took that motion under advisement (doc. # 137).

For the following reasons, the motion for class certification is DENIED.

1

# I. Background[1]

### a. Factual Background

Xcelera is a conglomerate of technology companies controlled by the Viks and their father through VBI. In the late 1990s, Xcelera was one of the fastest growing technology groups in the United States. But in 2001, the dot-com bubble burst and the company's value plummeted. By 2004, Xcelera's stock had fallen from a high of $110 a share to around $1 a share.

Xcelera became delinquent in its federal reporting obligations. It failed to timely file its annual report with the SEC for the fiscal year ending January 31, 2004 and subsequently failed to file periodic reports in a timely manner. As a result, Xcelera was delisted by the American Stock Exchange in November 2004, which caused the price of its stock to fall to $.25 a share. The SEC deregistered all of Xcelera's securities in November 2006, causing a further loss in stock value of approximately $225 million.

Steginsky alleges that the defendants tanked the company on purpose. Freed of federally mandated reporting requirements, they could legally withhold information from minority shareholders, who, not knowing the true value of their shares, might sell back their stock at an artificially deflated price. From 2006 until 2010, the Viks purportedly instructed employees to refuse to disclose any information regarding the company's financial health to shareholders. Shareholders who contacted the company were denied information regarding plans to revive Xcelera and instead were told that they were welcome to sell back their shares at the lowest recorded stock price, $.25 a share.

---

[1] The following facts are drawn from my previous rulings, as well as the parties' briefing on the motion for class certification and the exhibits attached thereto.

By 2010, unbeknownst to its shareholders, many of Xcelera's holdings had become profitable again.  In order to take advantage of the company's still-deflated stock price, the Viks privately approached a one-time Xcelera director, Hans Eirik Olav, and asked Olav to form a shell company through which the Viks could arrange a tender offer to acquire outstanding shares.  Olav agreed, and registered OFC in Malta, a country that does not require companies to disclose their directors' or shareholders' names.  OFC then sent a letter to Xcelera shareholders in December of 2010 offering to buy up to 10,000,000 shares of Xcelera at the last known price, $.25 per share.  In the letter, OFC reserved the right to transfer shares to its "affiliates," but did not list the name of any affiliate.  The tender offer remained open from December 17, 2010 until March 31, 2011.

As a minority shareholder, Steginsky received notice of the OFC tender offer.  Although she did not read the tender offer materials in full (the materials were sent to her daughters, who apparently only passed along some of the relevant information), Steginsky believed that Xcelera stock was worth more than the $.25 per share tender offer price.  Steginsky sent Olav two emails requesting information about the company, so that she could make an educated decision whether or not to sell, but Olav did not respond to either inquiry.  Steginsky also contacted her counsel in this case, after reviewing an article about one of the firm's other lawsuits against the defendants.

Steginsky tendered 100,010 shares of Xcelera to OFC at $.25 per share.  At the time she tendered, Steginsky believed that the defendants were perpetrating fraud by not informing shareholders of the actual value of the stock.  She sold anyway, because she needed the money.  Steginsky decided to file this lawsuit before she tendered her shares, and tendered her shares knowing she was going to file this lawsuit.

*b. Procedural History*

Steginsky instituted this lawsuit in February 2012, asserting violations of sections 10(b), 14(e), 20(a) and 20A(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78n(e), 78t(a) and 78t–l(a), and Rules 10b–5 and 14e–3 promulgated thereunder, 17 C.F.R. §§ 240.l0b–5 and 240.14e–3, as well as common law claims for breach of fiduciary duty. On March 14, 2013, I dismissed Steginsky's federal claims, holding that the assertions of market manipulation "defied economic reason" and that the defendants had no duty to disclose information to Steginsky or other shareholders.  I also dismissed the common law claims, because there was no longer a basis for exercising supplemental jurisdiction.  *Steginsky v. Xcelera, Inc.*, No. 3:12-CV-188 SRU, 2013 WL 1087635 (D. Conn. Mar. 14, 2013), *aff'd in part, vacated in part*, 741 F.3d 365 (2d Cir. 2014).  The Second Circuit affirmed with respect to the market manipulation claims, but reversed and remanded with respect to the insider trading and common law claims.  *Steginsky v. Xcelera, Inc.*, 741 F.3d 365 (2d Cir. 2014).

After the Second Circuit's remand, Xcelera, VBI and the Viks renewed their motion to dismiss, seeking dismissal of Steginsky's section 20A and common law claims, and dismissal of the federal insider trading claims to the extent that they are based on transactions other than the OFC tender offer.  At a hearing on September 4, 2014, I denied that motion with respect to the section 20A and common law claims, but dismissed the plaintiff's claims to the extent that they are based on transactions other than the tender offer.  Steginsky now moves to certify a class of those who sold to OFC in the tender offer.  She also seeks, once again, to sue on behalf of anyone who sold Xcelera stock to any of the defendants on or after February 6, 2007.

## II.   Discussion

Class certification is appropriate "only if the trial court is satisfied, after a rigorous analysis," that the requirements of Rule 23 have been met.  *Wal-Mart Stores, Inc. v. Dukes*, 131

S. Ct. 2541, 2551 (2011) (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)).  That

"rigorous" analysis proceeds in two steps.  First, the district court must analyze whether the

proposed class satisfies Rule 23(a)'s four threshold requirements:

> (1) numerosity ("the class is so numerous that joinder of all members is impracticable"), (2) commonality ("there are questions of law or fact common to the class'), (3) typicality ("the claims or defenses of the representative parties are typical of the claims or defenses of the class"), and (4) adequacy of representation ("the representative parties will fairly and adequately protect the interests of the class").

*In re Am. Int'l Grp., Inc. Sec. Litig. ("In re AIG")*, 689 F.3d 229, 238 (2d Cir. 2012)

(quoting Fed. R. Civ. P. 23(a)).

Second, the district court must determine whether the class action can be maintained

under Rule 23(b)(1), (2), or (3).  *Id.*  The plaintiff in this case seeks to certify a class under Rule

23(b)(3), which permits certification where the court "finds that the questions of law or fact

common to class members predominate over any questions affecting only individual members,

and that a class action is superior to other available methods for fairly and efficiently

adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3); *Teamsters Local 445 Freight Div.*

*Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

> Matters pertinent to predominance and superiority include:
>
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  The purpose of these requirements is to ensure that a "class will be

certified only when it would achieve economies of time, effort, and expense, and promote

uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or

bringing about other undesirable results." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) (internal citation and quotation marks omitted).

"The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." *Id.*; *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014) ("[P]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23."). Determining whether the plaintiff has satisfied her burden on class certification may entail some overlap with the merits of the underlying claim; however, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013); *see also In re Initial Public Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006).

A.  Certification of the Proposed Tender Offer Class

The defendants oppose class certification on the grounds that Steginsky's claims are not typical of the class, because she is subject to "unique defenses," and that common questions of law and fact do not predominate over individualized inquiries.

i.  *Typicality*

"To establish typicality under Rule 23(a)(3), the party seeking certification must show that each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (internal quotation marks omitted); *see also, e.g.*, *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992). The typicality requirement assures that "the named plaintiff's claim and the class claims are so interrelated that

the interests of the class members will be fairly and adequately protected in their absence."
*Falcon*, 457 U.S. at 158.

"The mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification . . . [however] class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation."[2] *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990); *see also Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) (citing *Gary Plastic*).  That is so because of "the danger that absent class members will suffer if their representative is preoccupied with defenses unique to [her]." *Baffa*, 222 F.3d at 60.

"At the class-certification stage, a court's analysis of unique defenses centers on whether these defenses will unacceptably detract from the focus of the litigation to the detriment of absent class members." *In re Omnicom Grp., Inc. Sec. Litig.*, No. 02 CIV. 4483 (RCC), 2007 WL 1280640, at *4 (S.D.N.Y. Apr. 30, 2007) (citing *Baffa*, 222 F.3d at 59).  It is not necessary to "definitively resolve whether such defenses would succeed on their merits"; certification is routinely refused when the court is "confronted with a sufficiently clear showing of the defense's applicability to the representative plaintiff." *Id.* (citing *Kline v. Wolf*, 702 F.2d 400, 403 (2d Cir. 1983) (district court need not resolve whether defense would ultimately prevail)); *see also Landry v. Price Waterhouse Chartered Accountants*, 123 F.R.D. 474, 476 (S.D.N.Y. 1989) ("[W]hether these defenses will be successful is of no matter . . . . Each of these plaintiffs would be required to devote considerable time to rebut the claim that their purchases were based not on

---

[2] *Gary Plastic* recognized that the problems caused by "unique defenses" reasonably could be framed in terms of the "typicality" or the "adequacy" requirement.  903 F.2d at 180 (citing 7A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 1764, at 259–60 (2d ed. 1986) (typicality); 3B J. Moore & J. Kennedy, Moore's Federal Practice ¶ 23.07[1], at 23-192 (2d ed. 1987) (adequacy)).

the integrity of the market, but on non-public information that they received . . . ."); *In re Indep. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 481 (S.D.N.Y. 2002) (citing *Landry*). By contrast, courts will not decline to certify where the purported unique defenses "seem to rest on little more than speculation." *Wallace v. IntraLinks*, 302 F.R.D. 310, 316 (S.D.N.Y. 2014).

In *Gary Plastic*, the Second Circuit affirmed the district court's denial of class certification where the plaintiff was "subject to several unique defenses," including its decision to purchase CDs from the defendants "despite having notice of, and having investigated, the alleged fraud." 903 F.2d at 179-80. In *Baffa*, the Second Circuit upheld the district court's rejection of a proposed class representative who was a sophisticated broker with access to more information than other investors in the class, reasoning: "[w]hile perhaps no one facet of [the proposed representative's] claim renders it atypical," the circumstances surrounding her decision to purchase the defendant's stock would subject her to unique defenses. 222 F.3d at 60. Similarly, in both *Salsitz v. Peltz*, 210 F.R.D. 95, 98 (S.D.N.Y. 2002), and *Kamerman v. Ockap Corp.*, 112 F.R.D. 195, 198 (S.D.N.Y. 1986), the district court held that the plaintiffs' securities fraud claims were atypical, because the plaintiffs did not rely on the alleged fraudulent misrepresentations or omissions.

### 1. Securities Fraud Claims

The defendants assert that Steginsky's securities fraud claims are not typical of the proposed class, because they are subject to the unique defense of non-reliance. "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 159 (2008). Proof of reliance ensures that there is a proper "connection between a defendant's misrepresentation and a plaintiff's injury." *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988). As pertinent to this

case, the Supreme Court has "dispensed with positive proof of reliance" where the plaintiff's claims are based on an omission of material fact by one with a duty to disclose. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 154 (1972); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 384 (1970); *see also Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013).

Reliance is presumed in cases of non-disclosure because, as a practical matter, it is often impossible to demonstrate reliance on statements that were never made. *duPont v. Brady*, 828 F.2d 75, 78 (2d Cir. 1987); *Wilson v. Comtech Telecomm. Corp.*, 648 F.2d 88, 93 (2d Cir. 1981). The presumption is not absolute: the defendants may rebut it by proving by a preponderance of the evidence that the plaintiff did not rely on the alleged omissions – i.e., "disclosure of that information would not have altered the plaintiff's investment decision." *duPont*, 828 F.2d at 78; *In re Beacon Assoc. Litig.*, 282 F.R.D. 315, 330 (S.D.N.Y. 2012).

The Second Circuit, however, has clarified that even where an omission is material, the presumption of reliance applies "only where it is logical to do so." *Lewis v. McGraw*, 619 F.2d 192, 195 (2d Cir. 1980) (internal citations omitted). The presumption does not apply where reliance is not possible "under any imaginable set of facts," because, in those circumstances "such a presumption would be illogical in the extreme." *Id.*; *see also, e.g.*, *Osofsky v. J. Ray McDermott & Co.*, 725 F.2d 1057, 1059 (2d Cir. 1984); *Panter v. Marshall Field & Co.*, 646 F.2d 271, 284 (7th Cir. 1981) ("[W]hen the logical basis on which the presumption rests is absent, it would be highly inappropriate to apply the *Mills-Ute* presumption.").

Reliance will not be presumed, for example, if the allegedly false and misleading information was made publicly available before a plaintiff tendered her shares. *Wardrop v. Amway Asia Pac. Ltd.*, No. 99 CIV 12093 DC, 2001 WL 274067, at *5 (S.D.N.Y. Mar. 20, 2001), *aff'd*, 26 F. App'x 89 (2d Cir. 2002). Similarly, "no one who saw through the fraud

would be able to sue for fraud, for he could not have relied directly or indirectly." *Stark Trading v. Falconbridge, Ltd.*, 552 F.3d 568, 573 (7th Cir. 2009); *Manela v. Garantia Banking, Ltd.*, 5 F. Supp. 2d 165, 174 (S.D.N.Y. 1998) (Rejecting argument that claim should not be dismissed simply because plaintiff "was not hoodwinked," because "[t]he core of a Rule 10b–5 claim is fraud" and if "there is no fraud, there is no claim."). If the presumption of reliance is either inapplicable or rebutted with respect to the class representative, then the proposed representative "is subject to unique defenses and may not represent the class." *Kamerman*, 112 F.R.D. at 198.

The defendants argue that the *Affiliated Ute* presumption should not apply or, alternatively, that they have thoroughly rebutted it, because Steginsky did not rely on the defendants' alleged omissions in deciding to tender her shares. At her deposition, Steginsky testified that, although she did not read the tender offer materials in their entirely, she believed that Xcelera was worth more than $.25 per share at the time of the offer.[3] Defs.' Opp'n. Ex. E at 12-14, 16, 19-20, 23 (Steginsky Dep. 72:22-73:4; 74:11-20; 78:18-23; 123:1-124:24; 131:6-22). As a result, she sent Olav two emails requesting information about the company, so that she could make an educated decision whether or not to sell. *Id.* at 12 (Steginsky Dep. 72:8-13).

---

[3] The defendants assert that this also defeats typicality, because Steginsky admitted that she did not know whether information about Xcelera's financial condition was included in the materials and would not have known anything about Xcelera's financial condition before tendering, even if that information was contained in the materials. *Id.* at 25 (Steginsky Dep. 133:8-12). Although most if not all of the approximately forty-five other shareholders that held Xcelera shares in their own names likely would have read the tender offer materials, there is at least some case law indicating that a class representative's lack of actual knowledge of the omissions at the time she tendered does not defeat typicality in situations where a classwide presumption of reliance applies. *See In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 46 (S.D.N.Y. 2013) ("Whether the named plaintiffs read the disclosure documents at issue is . . . unimportant to the typicality inquiry. . . . Plaintiffs are entitled to a class-wide presumption of reliance. And '[i]n the context of complex securities litigation, attacks on the adequacy of the class representative based on the representative's ignorance or credibility are rarely appropriate.'" (internal citations omitted)); *Cf. In re Livent, Inc. Noteholders Sec. Litig.*, 211 F.R.D. 219, 223 (S.D.N.Y. 2002) (denying certification where named plaintiffs did not examine financial documents and no classwide presumption of reliance was available). Regardless, there is ample evidence that Steginsky's lack of reliance on the alleged omissions will become the focus of this litigation, whether or not her lack of knowledge of the contents of the tender offer materials makes her claims atypical.

Steginsky thought that no one would buy $2.5 million worth of securities if those securities did not possess greater value than the sale price, or at least have the strong potential to appreciate in value.  *Id.* at 12-14, 21 (Steginsky Dep. 72:20-74:5; 125:3-13).  She interpreted Olav's lack of response to her emails as confirmation that the tender offer price did not reflect the true value of the shares.  *See id*.

Steginsky believed that the defendants were perpetrating fraud by not informing shareholders of the actual value of Xcelera's stock.  *Id.* at 15 (Steginsky Dep. 77:5-17).  She contacted her counsel in this case before deciding to tender, after reading about one of the firm's other lawsuits against the defendants.  *Id.* at 25-26, 29-31 (Steginsky Dep. 133:21-134:15; 162:21-163:13; 164:9-25).  The substance of her conversation with counsel was not revealed at her deposition, but Steginsky testified that she decided to file this lawsuit before she tendered her shares, and tendered her shares knowing she was going to file this lawsuit.  *Id.* at 15-16 (Steginsky Dep. 77:18-19; 78:3-5, 11-13).  Steginsky testified that she sold her shares despite suspecting fraud, because she needed the money.  *Id.* at 20-21 (Steginsky Dep. 124:24-125:2).

Steginsky's deposition testimony does not indicate whether she had actual knowledge that OFC omitted any relevant financial information from the tender offer materials.  It is indisputable, however, that she firmly believed a fraud was afoot and contacted counsel and decided to file a lawsuit before tendering her shares.  Courts do not presume reliance where a plaintiff voluntarily transacts with her deceivers after detecting the alleged fraud.  *See Stark Trading*, 552 F.3d at 573; *Manela*, 5 F. Supp. 2d at 174; *Kamerman*, 112 F.R.D. at 198.  Application of the presumption of reliance in these circumstances would be "illogical in the extreme."  *Lewis*, 619 F.2d at 195; *Wardrop*, 2001 WL 274067, at *5 (declining to presume reliance where "plaintiffs could not have relied on the alleged false and misleading

representation because the information was publicly available and plaintiffs filed the complaint before the tender offer period expired"). Presuming reliance here would also run counter to public policy; federal securities fraud laws are designed to rectify harms caused by fraud, not to reward those who discover the wrongdoer's deception and hope to profit from it through a lawsuit. *See, e.g.*, *Stark Trading*, 552 F.3d at 573; *Manela*, 5 F. Supp. 2d at 174.

There is no indication that other investors in the proposed class suspected fraud, contacted counsel, and/or decided to file a lawsuit before tendering their shares to OFC. Thus, without passing judgment on the merits of her case, it is clear that Steginsky's apparent lack of reliance will subject her to unique defenses that will "unacceptably detract from the focus of the litigation to the detriment of absent class members." *In re Omnicom Grp.*, 2007 WL 1280640, at *4 (citing *Baffa*, 222 F.3d at 59); *cf.*, *In re Sanofi-Aventis Sec. Litig.*, 293 F.R.D. 449, 454-55 (S.D.N.Y. 2013) (lead plaintiff's knowledge of relevant financial information did not defeat typicality, even if it might have defeated reliance, where knowledge was not unique to plaintiff). Class certification is inappropriate in this case, because the presence of unique defenses renders Steginsky's claims atypical of those of the rest of the proposed class. *See Gary Plastic*, 903 F.2d at 180.

### 2. Common Law Breach of Fiduciary Duty Claims

The defendants assert that Steginsky's awareness of the alleged fraud likewise subjects her fiduciary duty claims to unique defenses. Under Cayman Islands law, which governs the plaintiff's non-federal claims, corporations and directors ordinarily do not owe fiduciary duties to minority shareholders. *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 364 (S.D.N.Y. 2006). The only exception is where there is a "special factual relationship" between the director and the shareholder that brings the director "into direct

and close contact with the shareholders in a manner capable of generating fiduciary obligations."
*Peskin v. Anderson*, [2001] 1 B.C.L.C. 372, ¶ 33, 2000 WL 1841707 (Dec. 14, 2000). *Peskin*
indicates that an insider trading situation might give rise to fiduciary duties, but implies that there
must be fairly direct involvement for a "special factual relationship" to arise. *See id.* ¶ 34.

The defendants assert that Steginsky's deposition testimony demonstrates that no "special
factual relationship" existed here. Rather than being "induced to repose any trust or confidence"
in the defendants, Steginsky "responded to the OFC tender offer with suspicion, distrust, and
litigation." Defs.' Opp'n. 26. Given Steginsky's demonstrated lack of trust and the arms-length
nature of the tender offer transaction, the defendants argue, the existence of a "special factual
relationship" undoubtedly will be the focus of the breach of fiduciary duty claims.

Yet, that likely will be true for all of the investors in the proposed class, because the
existence of a "special factual relationship" appears to depend on the facts and circumstances of
each shareholder's decision to tender. *See Peskin*, 1 B.C.L.C. 372, ¶¶ 32-37. Other shareholders
may not have openly distrusted the defendants to the extent that Steginsky did, but all will be
subject to the same defense – i.e., the lack of a "special factual relationship" giving rise to
fiduciary duties, due to the arms-length nature of the transaction. Thus, as discussed below, the
argument bears more on "predominance" than "typicality." *See, e.g.*, *In re Sanofi-Aventis*, 293
F.R.D. at 454-55 (rejecting contention that lead plaintiffs with "generalized knowledge of the
financial press" were subject to unique defenses, because that knowledge was not "unique" given
that rest of market had access to same information).

> ii. *Predominance*

Rule 23(b)(3)'s predominance requirement "tests whether proposed classes are
sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v.*

*Windsor*, 521 U.S. 591, 623 (1997). The requirement is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *In re AIG*, 689 F.3d at 240 (quoting *Myers*, 624 F.3d at 547).

"When determining whether common issues predominate, courts focus on the liability issue . . . and if the liability issue is common to the class, common questions predominate over individual ones." *Tiro v. Public House Inv., LLC*, 288 F.R.D. 272, 280 (S.D.N.Y. 2012) (quoting *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 157-58 (S.D.N.Y. 2002)). Thus, "[c]onsidering whether 'questions of law or fact common to class members predominate' begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011). Defenses may arise that "affect different class members differently," but that does not "compel a finding that individual issues predominate over common ones." *Brown v. Kelly*, 609 F.3d 467, 483 (2d Cir. 2010). "As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of a defense will not automatically foreclose class certification under Rule 23(b)(3)." *Id.*

The defendants contend that individualized inquiries predominate in both the federal securities fraud and common law fiduciary duty claims; thus, neither set of claims is amenable to classwide proof. With respect to the common law claims, the defendants are correct. Under the standard articulated in *Peskin*, no fiduciary duty is owed unless a director has "direct and close contact with the shareholders in a manner capable of generating fiduciary obligations," which appears to be a heavily fact-dependent analysis. *Peskin*, [2001] 1 B.C.L.C. 372, ¶ 33. Therefore, the existence of a "special factual relationship" will need to be analyzed on a shareholder-by-

14

shareholder basis and class certification of the breach of fiduciary duty claims is inappropriate. With respect to the securities fraud claims, however, the defendants confuse the "typicality" and "predominance" inquiries.

The elements of a securities fraud claim under section 10(b) and Rule 10b–5 are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton*, 131 S. Ct. at 2184 (internal citations and quotation marks omitted). "Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Id.* If a securities fraud plaintiff fails to establish an applicable presumption of reliance, a Rule 10b–5 suit cannot proceed as a class action. *Halliburton*, 134 S. Ct. at 2416. Without the presumption of reliance, "[e]ach plaintiff would have to prove reliance individually, so common issues would not 'predominate' over individual ones, as required by Rule 23(b)(3)." *Id.* (internal citations omitted).

The defendants assert that the securities fraud claims are not subject to classwide proof, because whether individual investors were "deceived" by the alleged omissions depends on their knowledge of Xcelera's financial condition at the time they tendered their shares.[4] The material non-public information purportedly withheld was Xcelera's then-current financial information. At the time of the tender offer, Xcelara had not publicized its financial information for the better part of a decade. Thus, the defendants argue, most putative class members certainly would have "known what they didn't know" – that Xcelera was withholding financial information – and cannot claim to have been "deceived" by the alleged omissions or to have relied on them. *See*

---

[4] In their memorandum opposing class certification, the defendants separate these inquiries into two issues: (1) whether investors were "deceived" by the omissions and (2) whether they relied on them. It appears, however, that the applicability of the presumption of reliance turns on whether investors can claim to have been "deceived."

Defs.' Opp'n. 21 (citing *Jensen v. Kimble*, 1 F.3d 1073, 1078 (10th Cir. 1993); *McCormick v. Fund Am. Cos., Inc.*, 26 F.3d 869, 880 (9th Cir. 1994); *Willco Kuwait (Trading) S.A.K. v. deSavary*, 843 F.2d 618, 627 (1st Cir. 1988)).

The decisions cited by the defendants, however, are not truly on point. In all of those cases the plaintiffs "knew what they didn't know," because they unsuccessfully sought out the omitted information. In *Jensen*, for example, the plaintiff asked the defendant about the terms of the deal before he sold his shares. The defendant expressly replied that he "could not reveal the nature of the deal, the identity of the merger partner, or the identity of those who would receive the plaintiffs' stock." 1 F.3d at 1078. Because the plaintiff knew exactly what information was being withheld before he sold his shares, he could not viably claim to have been deceived or misled. *Id.* Similarly, in *Willco*, the plaintiff entered into a deal with the defendant after requesting information and documents from the defendant that the defendant "adamantly refused" to provide. 843 F.2d at 627.

Those decisions undercut Steginsky's argument that *she* was deceived by the alleged omissions, because she attempted to contact Olav several times to obtain information about Xcelera's financial state and sold her shares knowing that she did not have the information she sought. But there is no evidence that the other shareholders did not take the tender offer materials at face value. Given that Xcelera stock was trading at $.25 per share at or around the time that Xcelera's stock was deregistered, unsophisticated investors might have been deceived by the omission of Xcelera's current financial information and relied on those omissions in deciding to sell their shares. [5] Of course that is purely speculative; it is difficult to make any

---

[5] Even if some investors were not deceived, the potential for rebuttal of the presumption of reliance with respect to some class members does not necessarily defeat the predominance requirement. *Halliburton*, 134 S. Ct. at 2412 ("That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate.").

such determinations about the knowledge or sophistication of the proposed class. But without evidence to the contrary, the *Affiliated Ute* presumption is available on a classwide basis, subject to rebuttal.

B. <u>Standing to Represent a Broader Class</u>

At the hearing on September 4, 2014, I ruled that Steginsky had not adequately pled any insider trading claims outside of the tender offer and that even if she had; she lacked standing to assert claims on behalf of a broader class. In her motion for class certification, she seeks revision of the standing aspect of that ruling pursuant to Fed. R. Civ. P. 54(b).

Rule 54(b) provides that "any order or other decision . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). The Second Circuit has "limited district courts' reconsideration of earlier decisions under Rule 54(b) by treating those decisions as law of the case." *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003). Thus, district courts have discretion to "revisit earlier rulings in the same case, subject to the caveat that 'where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'" *Id.* (citing *Zdanok v. Glidden Co.,* 327 F.2d 944, 953 (2d Cir.1964)). Such decisions ordinarily may not be changed "unless there is 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice.'" *Id.* (citing *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)).

Insider trading claims, like all section 10(b) and Rule 10b–5 claims, must be pled with the specificity required by Rule 9(b) and the PSLRA. *See ATSI Commc'n, Inc. v. Shaar Fund,*

*Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (securities fraud claims require heightened pleading standard under Rule 9(b) and the PSLRA); *S.E.C. v. Lyon*, 529 F. Supp. 2d 444, 452 (S.D.N.Y. 2008) (section 10(b) insider trading claims must be pled with particularity under Rule 9(b)); *see also Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d 435, 447 (S.D.N.Y. 2001) (PSLRA applies to insider trading claims).  I ruled that Steginsky had not adequately pled any insider trading claims outside of the tender offer, because the relevant allegations failed to comply with the pleading requirements of Rule 8, much less the heightened pleading standards of Rule 9(b) and the PSLRA.

Steginsky has not added any new facts to bolster her claims.  She had ample opportunity to amend her complaint, but chose not to do so.  Therefore, aside from the allegations related to the tender offer, the only facts in the complaint connected to insider trading are brief statements about the defendants' putative scheme to have "disgruntled investors" sell back their stock at a bargain prior to the tender offer.  Those statements are vague; they do not identify any dates, particular sellers, shares sold, or the existence of nonpublic information about the company's value that was known at the relevant times and not disclosed.  *See, e.g.*, *Salinger v. Projectavision, Inc.*, 972 F. Supp. 222, 233 (S.D.N.Y. 1997) (dismissing securities fraud claim where Complaint failed to include "factual allegations regarding the date of any sale, the seller for any particular sale, the number of shares sold, or the price for those shares").  Accordingly, there is no reason to revise my earlier ruling that the non-tender offer claims in the complaint fail to meet the applicable pleading standard.

Even if Steginsky had adequately pled additional insider trading claims, she lacks standing to sue on behalf of a broader class, because she did not make purchases or sales outside of the context of the tender offer.  Steginsky cites *NECA-IBEW Health & Welfare Fund v.*

18

*Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012), for the proposition that she has standing, but the holding in that case does not support Steginsky's argument.

In *NECA*, the Second Circuit clarified the rules of class standing, holding that a plaintiff has standing if she "plausibly alleges (1) that [s]he personally has suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant. . . and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." 693 F.3d. at 162 (internal citations and quotation marks omitted). Nothing in *NECA* alters the requirement that the class representative must "possess the same interest and suffer the same injury as the class members." *See Falcon*, 457 U.S. 147, 156 (1982) (quoting *East Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U .S. 395, 403 (1977)).

The named plaintiff in *NECA* purchased Residential Mortgage-Backed Securities ("RMBS") certificates from the defendants and sought to represent a class of purchasers of all certificates that were issued under the same allegedly false and misleading SEC Form S–3 and base prospectus. Those certificates, however, had been sold in seventeen separate offerings with unique offering documents, and the named plaintiff had purchased certificates in only two of the seventeen offerings. *See NECA*, 693 F.3d at 149. Applying the standard discussed above, the Second Circuit permitted certification of a class of purchasers of securities sold by the same originators in different tranches. At the same time, however, the Court held that the plaintiff lacked standing to sue on behalf of purchasers with different originators, even though all of the securities were issued using the same SEC Form S–3 and base prospectus. Whether a false or misleading statement "implicates the same set of concerns for distinct sets of plaintiffs" depends on "the nature and content of the specific misrepresentation alleged"; thus, the claims of

19

plaintiffs who purchased from a different originator "could turn on very different proof." *Id.* at 162-64.

Here, the claims of the tender offer "class" likewise could turn on different proof than potential insider trading claims brought by non-tender offer plaintiffs. As the defendants point out, the tender offer documents provided shareholders with a uniform set of solicitation materials. The alleged omissions and manner in which information was omitted was the same for all potential sellers. By contrast, any hypothetical other transactions would have occurred in different circumstances, "pursuant to individually negotiated terms," and potentially involving different omissions or misrepresentations. Thus, those claims "could turn on very different proof" and Steginsky lacks standing to sue on behalf of those investors. *See id.*

It is apparent that Steginsky is attempting to circumvent the rules of pleading in securities fraud cases in order to obtain discovery to which she is not entitled. Nothing raised in her motion alters the conclusion that she does not have standing to bring claims on behalf of purchasers other than the proposed "tender offer class."

## III.    Conclusion

For the foregoing reasons, the motion for class certification is DENIED.

Dated at Bridgeport, Connecticut this 10th day of March 2015.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge